UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | BANKRUPTCY NO. 06-11418 |
| | : | CHAPTER 7 |
| REGIONAL ANESTHESIA ASSOCIATES, PC, ALLEGED DEBTOR | : | |
| | : | |
| REGIONAL ANESTHESIA ASSOCIATES, PC, Movant | : | DOCUMENT NO. 16 |
| vs. | : | |
| PHN PHYSICIAN SERVICES, INC., Respondent | : | |

APPEARANCES:

MICHAEL A. SHINER, ESQ. AND BRADLEY TUPI, ESQ., PITTSBURGH, PA, ATTORNEYS FOR REGIONAL ANESTHESIA ASSOCIATES, P.C.
STEPHEN H. HUTZELMAN, ESQ., ERIE, PA, AND STEPHEN J. MIRIZIO, ESQ., SHARON, PA, ATTORNEYS FOR PHN PHYSICIAN SERVICES, INC.
RICHARD CROMER, ESQ., PITTSBURGH, PA, ATTORNEY FOR OHIO VALLEY GENERAL HOSPITAL

WARREN W. BENTZ, U.S. BANKRUPTCY JUDGE

FEBRUARY     15    , 2007

## OPINION[1]

### Introduction

The within Chapter 7 bankruptcy case was commenced on November 3, 2006 ("Petition Date") with the filing of an Involuntary Petition pursuant to 11 U.S.C. §303 against Regional Anesthesia Associates, P.C. ("RAA" or "Alleged Debtor") by PHN Physician Services, Inc. ("PHN").

The Alleged Debtor timely controverted the Petition with the filing of its Motion to

---

[1] This Opinion constitutes this Court's findings of fact and conclusions of law.

1

Dismiss Involuntary Bankruptcy Petition.

A trial was held on January 4, 2007. On January 5, 2007, an Order was entered which dismissed the Involuntary Petition. In the Order, we retained jurisdiction to consider an appropriate allowance for fees and expenses incurred by the Alleged Debtor in connection with the filing of the bankruptcy case. We write to explain the rationale of our decision.

## Procedural Background

PHN was the sole petitioning creditor when it commenced this involuntary case. In its Motion to Dismiss, the Alleged Debtor asserts that the Involuntary Petition is defective and must be dismissed because:

1) PHN's debt from RAA is subject to a bona fide dispute as to both validity and amount;

2) RAA has more than 12 creditors and PHN is the only petitioning creditor; and

3) PHN filed the Involuntary Petition in bad faith.

The Court directed PHN to file a Response to the Motion to Dismiss and fixed a short non-evidentiary hearing for December 18, 2006 to determine if there were issues of fact that required an evidentiary hearing.

PHN filed its Response on December 14, 2006. In its Response, PHN asserts that:

1) the claim of PHN is not subject to a bona fide dispute;

2) RAA is not paying its bills as they become due; and

3) PHN believes that RAA has only about 10 creditors, but PHN expects other creditors will join in the Petition prior to the December 18, 2006 hearing.

At the hearing on December 18, the parties presented their arguments and it appeared that

there were factual issues regarding whether the debt of RAA to PHN was subject to a bona fide dispute and as to the number of creditors of RAA. The Court fixed a short period of discovery and scheduled a trial for January 4, 2007.

On December 22, 2006, PHN filed a Motion to Compel Discovery. RAA filed a Response on December 26 and it appearing to the Court that the documents requested by PHN were beyond those necessary for resolution of the issues for trial on January 4, 2007, the Motion to Compel was dismissed without prejudice.

Counsel for both parties scheduled depositions for December 28, 2006. A dispute arose over the scope of the questioning and the depositions were not completed. On January 2, 2007, RAA filed a Motion in Limine to Preclude Testimony at the trial fixed for January 4, 2007. PHN immediately filed an Answer. The Motion in Limine was discussed prior to commencement of the testimony on January 4, 2006. RAA's counsel stated, "we are not requesting an extension of this hearing. Because the nature of an involuntary Petition and the damage that it does to the Alleged Debtor's business requires the Court to act promptly." The Court determined to proceed with the testimony. All witnesses presented were permitted to testify.

Also on January 2, 2007, Ohio Valley General Hospital ("OVGH") filed a NOTICE OF CLAIM, SUPPORT FOR THE INVOLUNTARY PETITION AND LIMITED RESPONSE TO ALLEGED DEBTOR'S MOTION TO DISMISS INVOLUNTARY BANKRUPTCY PETITION. OVGH asserts that it is owed $350,000 by the Alleged Debtor which is not being paid as payments come due and that the Alleged Debtor failed to list OVGH as a creditor. OVGH states that it supports the position of PHN, but "[b]ecause the value of the OVGH's collateral is not readily ascertainable, OVGH is not seeking to join the involuntary petition at

this time.

Counsel for OVGH entered an appearance at the time of trial. The following colloquy took place:

> MR. CROMER: Your Honor, if it please the Court, my name is Richard Cromer. I'm here on behalf of Ohio Valley Regional Hospital. I don't plan to participate in any proceedings today. We did file a notice of our claim with the Court. And I'm here merely as an observer.
> THE COURT: How do you spell your last name?
> MR. CROMER: C-R-O-M-E-R.
> THE COURT: Your client is Ohio Valley.
> MR. CROMER: Ohio Valley General Hospital, Your Honor. We filed a notice of claim. I believe that we filed that on Tuesday of this week, Your Honor.
> THE COURT: You don't want to be a petitioner but you're interested.
> MR. CROMER: We just want – yeah, we're interested, yes.
> THE COURT: But you don't have enough confidence in your case to get into the ballgame.
> MR. CROMER: That's right. Thank you, Your Honor.

On the day before trial, January 3, 2007, PHN filed Joinders in the Involuntary Petition by additional creditors, Coding Network and Jameson Memorial Hospital ("Jameson"). On the same date as its Joinder was filed, Coding Network advised counsel for PHN that "The Coding Network, L.L.C. wishes to immediately withdraw as a petitioner" in the RAA case.

Trial was conducted on January 4, 2007. After consideration of the testimony of the witnesses and the exhibits presented, an order of dismissal of the case was entered on January 5, 2007. PHN filed its Notice of Appeal on January 10, 2007.

## 11 U.S.C. §303

Section 303 of the Bankruptcy Code governs involuntary petitions. Section 303(b) provides, in pertinent part, as follows:

(b) an involuntary case against a person is commenced by the filing with the

> bankruptcy court of a petition under chapter 7 or 11 of this title–
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $12,300 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $12,300 of such claims.

11 U.S.C. §303(b).

Section 303(h)(1) further provides, in pertinent part, that where the petition has been timely controverted, "the court shall order relief. . .only if–the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."  11 U.S.C. §303(h)(1).

> The phrase "as to liability or amount" was added to § 303(b)(1) and (h)(1) following the phrase "bona fide dispute" by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109-8, §§ 1234(a)(1)(A) and (a)(12), 119 Stat. 23 (April 20, 2005).  Prior to the amendment, a dispute limited to the amount was not a "bona fide dispute" as to the entire claim, at least under § 303(b)(1).  E.g., In re Focus Media, Inc., 378 F.3d 916, 926 (9th Cir. 2004) ("a dispute as to the amount of the claim gives rise to a bona fide dispute only when (1) it does not arise from a wholly separate transaction and (2) netting out the claims of the debtors could take the petitioning creditors below the amount threshold of § 303") (internal quotation marks omitted); Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC), 330 F.3d 111, 120 (2d Cir. 2003) (bona fide dispute exists "where a claim for offset arises out of the same transaction and is directly related to the creditor's underlying claim, and, if valid, could serve as a complete defense to that claim"); see In re Sims, 994 F.2d 210, 221 (5th Cir 1993) (claim that petitioner failed to mitigate damages would serve only to reduce creditor's damage and not create bona fide dispute), cert. denied, 510 U.S. 1049 (1994). The 2005 amendment presumably eliminated the second part of the test. See 2 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 303.30[2][b], at 303-30 (15th rev. ed. 2006). As a result of the amendment, any dispute regarding the amount that arises from the same transaction and is directly related to the underlying claim should render the claim subject to a bona fide dispute.  Id.

5

<u>In re Euro-American Lodging Corp.</u>, ___ BR ___, 2007 WL 54014 (Bank. SD NY, Jan. 9, 2007).

<u>Discussion</u>

<u>Number of Creditors</u>

The parties dispute whether RAA had 12 or more creditors as of the Petition Date. We need not address this issue in detail, and for purposes of this decision, we accept PHN's assertion that RAA has less than 12 creditors. Accordingly, an involuntary petition against RAA can be brought by only one or more qualifying creditors which hold a claim against RAA "that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount. . . ." 11 U.S.C. §303(b)(1), (2).

PHN originally filed the Petition as a single petitioning creditor. Jameson subsequently joined as an additional petitioning creditor.[2] RAA posits that the claims of PHN and Jameson are the subject of a bona fide dispute and neither of the creditors is eligible to participate as a petitioning creditor. We heard extensive testimony about RAA's creditors. Other than the claims of Jameson, OVGH and PHN, which RAA asserts are disputed creditors, we find that RAA is generally paying its obligations as they become due.

<u>Jameson</u>

RAA provided anesthesia and pain management services to hospitals and surgical centers. RAA and Jameson entered into a contract dated March 31, 2004 entitled Agreement for

---

[2]On January 3, 2007, PHN filed a joinder in the Involuntary Petition by a third creditor, Coding Network. Immediately after its joinder was filed with the Court, Coding Network notified the parties that it withdrew as a petitioning creditor. The withdrawal is permitted. <u>See</u> <u>In re Vortex Fishing Systems, Inc.</u>, 277 F3d 1057, 1065-66, (9th Cir, 2002).

Anesthesiology Services, whereby RAA became the exclusive provider of anesthesia services to Jameson (the "Agreement").

The Agreement provides that "[a]s the sole source of compensation hereunder, [RAA] shall look exclusively to its patients."

The Agreement further provides for Jameson to provide necessary support personnel and to subsidize RAA's provision of anesthesiology services "in an amount equal to the difference between [RAA's] collections and its Operating Expense up to a maximum sum of Fifty Thousand ($50,000) Dollars per month. . .up to a maximum amount per year not to exceed Three Hundred Fifty Thousand ($350,000) Dollars."

On January 10, 2006, RAA executed a Memo of Understanding. It provides in part:

REGIONAL ANESTHESIA ASSOCIATES currently has $489,260 outstanding with Jameson Hospital. January 10, 2006, they are receiving an additional $60,000. All of these amounts have been secured by signed demand notes.

REGIONAL ANESTHESIA ASSOCIATES agrees to provide a check to Jameson for $60,000 payable January 16, 2006 for repayment of today's advance. They also agree that the remaining balance of $489,260 will be paid in full by Regional Anesthesia Associates or their successor in February 2006.

Later in 2006, in order for Jameson to consent to an assignment of the Agreement from RAA to PHN, RAA and Jameson executed a Reimbursement and Consent Agreement dated June 30, 2006. The Reimbursement and Consent Agreement states that "RAA is presently indebted to Jameson in the principal amount of $553,192.93."

The obligation of RAA to Jameson is disputed. Philip Lara, an administrative consultant for RAA, testified at trial as follows:

Q. This document [the Memo of Understanding] goes on to say that the balance of about 489,000 would be paid in full by RAA or its successors by February 2006; is that correct?

7

    A. Correct.
Q. Was it paid in full?
A. No.
Q. Has any portion of this claim been paid?
A. Yes. Probably most all of it has been paid.
Q. I think, you know, that wasn't – I think 250,000 was paid?
A. Well, this, along with some of these other agreements that we had with Jameson Hospital regarding the structuring of stipend payments. And what ended up happening, is we ended up employing significant amounts of employees that they didn't have in their budget that they normally would have employed per our contracts with them.

    And so because we ended up employing them and also performed on their – in their pain clinic. This also had to go with a pain clinic contract that we had, that ended up providing them with about $1.7 million of top line revenue and profits of over $600,000.

    So through our discussions after this memo, it was going to be decided that most of this would be turned into a stipend. Some of it may be repaid, depending on the direction of the group.
Q. Do you acknowledge that any amount of money is due to Jameson?
A. No, not at this time.

At a later point in the testimony, Lara testified further about the arrangement between

RAA and Jameson:

Q. First of all, could you just take a look at RAA Exhibit 245. Tell me what this document is.
A. It's our – it's an agreement between Regional Anesthesia Associates and Jameson Health System.
THE COURT: This is what exhibit? 24?
MR. SHINER: 24. I'm sorry, I should have marked that when I handed it to you, Your Honor. I apologize.
Q. Could I ask you to turn to Page 40 of the agreement. Could you read for me the – in Section B, starting one, two, three, four, five, six – nine lines down, the sentence starting, "The hospital will agree."
THE COURT: What page is that?
MR. SHINER: 40.
A. "The hospital will agree to write off or forgive 50 percent of the monies and the corporation shall pay back 50 percent of the start-up cost over a 60-month period plus interest calculated at a rate of prime minus 1 percent."
Q. Can you tell me what this is referring to.
A. It's referring to monies that were advanced to us to help us get started to staff – provide services and staffing service to Jameson Memorial Hospital.
Q. And that 50 percent write-off, was that – that 50 percent forgiveness, was that

8

reflected in the amount that Jameson appears to be claiming is due?
A. Correct.
Q. Was that or was it not? Was the 50 percent write-off included in the amount that Jameson is now claiming is due?
A. I'm not sure.
Q. Now, has Jameson provided any kind of a statement explaining what their claim is?
A. No.  They had not indicated to us that they were going to pursue this at all.
Q. Have they provided you any writings, any demands for payment, since the bankruptcy was filed?
A. Not at all.
Q. Have they contacted you –
A. Yes.
Q. – about this amount?
A. No, not on this amount.
Q. Additionally, could I draw your attention to Page 24 of the agreement.  And could you read the sentence at the top of the page that starts, "Hospital agrees."
A. "Hospital agrees that it will not contract with a former employee of the corporation to provide services in the anesthesia department while this agreement is still in effect."
Q. Did the hospital breach that provision of the agreement?
A. Yes.
Q. Are they employing former RAA employees?
A. I believe so.
Q. RAA has a claim against Jameson with respect to that, disputing the validity and the amount that is owed to Jameson.
A. I believe so.
Q. And, additionally, if you could just once again explain how you, you being RAA, advanced certain costs and paid certain amounts for employees and other services at Jameson Hospital that Jameson was supposed to provide under this contract and how you are entitled to the credits for it.
A. Well, we – Jameson Health System was supposed to hire – provide us with all of the resources to staff and run the pain clinic.  This was significant as we grew very, very quickly and it was successful.  And during that course, we ended up hiring and paying for approximately four or five people.  And we did that, A, because of the start-up – or not the start-up, but because the monies they were affording to us, and because they just didn't have a budget established to be able to bring those people on.
Q. And –
A. And it was an agreement that we had with the hospital, that we would do that.
Q. And you had received credit for that against the amount that you allegedly owed to the hospital.
A. Correct.
Q. And in fact, is it your believe that, if anything, Jameson now owes money to RAA?
A. Potentially, yes.

9

RAA has presented sufficient evidence to show that there are genuine issues of material fact that the claim by Jameson is the subject of a bona fide dispute as to liability or amount. Jameson fails to qualify as a petitioning creditor.

## PHN

PHN and RAA began negotiations in 2005 for the acquisition of RAA by PHN. PHN performed an extensive review of RAA's financial information. Rather than an outright purchase, the entities developed a plan where RAA's employees and contracts would be transitioned over a short term to PHN. Once the transition was complete, RAA would cease to exist. The purpose of this transition agreement was to minimize the amount of capital that PHN would need in order to accomplish the transaction.

In furtherance of the plan, RAA and PHN entered into two agreements effective May 1, 2006, a Practice Transition and Asset Transfer Agreement and an Employee Leasing and Interim Management Services Agreement.

The effect of the two agreements was that RAA transferred its contracts with hospitals and other entities to PHN and PHN became the employer of RAA's employees. RAA remained responsible for any of its liabilities that it incurred prior to the transfer. RAA was to begin to cease operations and wind up its business. RAA was to continue to collect its pre-transfer accounts receivable and pay its pre-transfer obligations with any excess going to the principals of RAA on account of their ownership interests.

In order to effectuate a smooth transition, RAA and PHN agreed that RAA needed to continue to operate until the contracts with the hospitals and other entities were assigned to

PHN. To accomplish the continued operation of RAA, the parties executed the Employee Leasing and Interim Management Services Agreement. The purpose was to enable RAA to continue to provide services to the hospitals and to continue billing patients for services until the contracts and billing could be transferred to PHN. As compensation for the services rendered by PHN during this interim period, RAA was to pay PHN's costs plus an 8% fee to cover indirect and overhead costs from post-transfer receivables. PHN was to bill RAA monthly and RAA was to remit payment to PHN within 15 days of receipt of invoice.

The relationship quickly deteriorated. RAA posits that PHN failed to pay certain necessary suppliers and vendors as it was to do under the Agreement; that PHN failed to maintain the level of personnel needed for operations and that PHN failed to utilize its line of credit to facilitate the ongoing operation.

PHN posits that RAA failed to pay PHN's invoices when due and was significantly in arrears. RAA posits that it was delinquent because of cash flow problems caused by PHN. As Philip Lara testified:

> A. Well, when we started this, the assumption was that PHN would have to utilize a line of credit on the start-up fees to get this going. We did the interim management agreement in order to minimize the amount of capital that it would require for
> PHN to invest in the business.
> It normally would have taken probably $2 million or more. We were able to narrow that down to between 700,000 and a million dollars, depending on the performance of
> the accounts receivable and the charges.
> As we ventured into this, we had issues with our billing company. And those issues that we felt were a result of Primary Health Network firing their billing company
> which was also our billing company. And they were located in the – they were physically located in the space that Primary Healthy Network also had some of its
> operations in, physician offices, et cetera.
> They were told to vacate those premises. And it resulted in a 30-day delay of them being able to submit claims timely, as they had in the past four or five years. Which
> resulted in a significant, you know, slowdown of our cash. Which would be what would be needed to pay the – these fees. And so, I'm sorry –

> Q. No, continue.
> A. As a result of this, we were – the reason I told that, as a result of this, we were in discussions where. And Mr. Laeng was asking for collateral or some type of security of RAA, like the accounts receivable, in order to ensure that they would ultimately continue to get paid.
> Q. Did RAA grant PHN a lien on its accounts receivable?
> A. No.
> Q. And would it be fair to say that at this point PHN was pressing RAA for money?
> A. Yes.
> Q. But as you had just testified, the money – the problems with cash flow were caused by actions of PHN.
> A. Correct.
> Q. And in this e-mail, is PHN refusing to pay obligations that it was – obligations of debts that it was required to pay under the agreements?
> A. I read it like that, yes.
> Q. So did that cause RAA to then have to pay those debts?
> A. Yes.
> Q. So RAA had to pay the debts that PHN was supposed to pay at the same time PHN was demanding payment from RAA.
> A. Correct. Essentially what happened was probably only five weeks into this it was determined that RAA had to make – you know, basically take care of all of the expenses and payments to keep the business moving forward. That didn't just include malpractice and things like that. It also included giving them money to meet the payroll obligations. Because they were unwilling at some point not to dip into their line of credit.

The situation continued to worsen. PHN appears to have been delinquent in paying RAA. RAA was funding payroll and expenses that PHN had agreed to fund. PHN wanted RAA to assign its receivables as collateral and according to Lara, was threatening interference with the hospitals and physician-employees and to file a lawsuit:

[a representative of PHN] informed me that, you know, we're going to make things, you know, messy for you, we're going to tell your hospitals that you aren't paying us, and your physicians, that there's a lawsuit about to happen.

In an effort to resolve the issues and to unwind the agreement, RAA determined to form a new group called Comprehensive Anesthesia and Pain Management Services ("CAPS") to assume the contracts with the hospitals and other providers:

Q. Was a result of this e-mail additional discussions that led to the memorandum of understanding?
A. Correct. All along through the summer, and even through the fall, and even on the morning of Monday, October 23rd when we had a big blowup in the practice, big meltdown, which was the terms that Lou would use, we had, you know, discussions about how can we make everybody whole here.
And, you know, since PHN decided, with us, that this was just too much – this required too much capital and little slip-ups and so forth, we're going to – you know, we just – they just didn't want to get involved. So, basically, they didn't want to move forward on the practice transition agreement and all the responsibilities and capital that comes with it.
We came up with a way to make them whole by we would form a new group, and that new group would assume the contracts. It would be a partnership between the physicians. And that was important, because this entire deal was only supposed to be a two-year deal. There was supposed to be a clear exit strategy, that at the end of two years we would form a new group. And we just decided we better form it sooner.
So we formed – the goal was that we would form a new group. And that vehicle would allow PHN – it would allow Regional Anesthesia to stop – stop operating as a business. It would allow the new group to assume those contracts and all the responsibilities, and it was a means to pay the money that PHN was claiming that was owed.
Q. And that was expressed in the memo of understanding?
A. That was expressed in the memo of understanding.

The Memo of Understanding is dated August 30, 2006 ("Memo"). The Memo contemplated that the new group, CAPS, would be formed and have the requisite financing in place by October 15, 2006 to pay all amounts due to PHN. The formation of CAPS failed. RAA blames the failure on the actions of PHN:

Q. Did this memo of understanding resolve the parties' disputes?

A. Pardon?
Q. Did it resolve the parties' disputes?
A. No, it didn't resolve the parties' disputes.
Q. Why not?
A. Because as we attempted to bring the new group up, we incorporated the new group, we got the articles of incorporation done. We actually got shareholders agreements done. We got commitments from the physicians in board meetings that we had, where the physicians said, we're going to go ahead and do this. But then, you know, quickly after, they started receiving phone calls and threats, that if they were to join this, despite the memo of understanding, despite that we were moving forward with the CAPS group, that they would be party to lawsuits that were out there that they were unaware of.
. . .
Q. Along those lines, can you tell me in detail about who received threats and phone calls and who they received them from.
A. I was directly told by Dr. Munda (phonetic), which is one of our newer physicians that started in January, that Lou Colella specifically called him, told him that if he were to – despite our representation, that look, PHN is telling us they don't want the group, they don't want to continue, they want us to form a new group. They were being told if they did form a new group, they would have – their employment contracts would be executed. And they had noncompetes in there. They weren't allowed to do that. They were told that they would be sued. They were told RAA is being sued and all kinds of money is owed. And, unfortunately, that caused us to continue to delay the formation of the new group.
Q. Do you have any other specific examples you can provide us with?
A. Yeah. I was told by Dr. Razzak, as well as Dr. Buckwalter was told the same, that Attorney Steve Mirizio contacted his attorney and said that there were lawsuits going back and forth, and that he could be sued. And that they planned on enforcing his noncompetes. Which would be contrary to us forming a new group. If we were forming a new group, why would they want to enforce noncompetes. So the physicians, which are clinicians, were getting very frustrated. And, you know, asking us, are you sure you're allowed to do this. And we were saying, yeah, they're telling us this is the way to go.
Q. And were there also threats to the CRNAs?
A. Yeah. After October 23rd, several CRNAs, Anthony Ferese, Mike Slattery, I believe Kevin Pollock, told us that they themselves or others were contacted by Lou Colella and threatened that if we were forming this new group, they would be sued. And that there was lawsuits going back and forth and money owed.
Q. And the threats were to enforce the noncompete provisions in the employment agreements?
A. That's what they said. Despite that there were noncompetes in the CRNA agreements. But they were told that there was lawsuits going back and forth.
Q. And during the time where RAA and Dr. Buckwalter, you and the others are working to form CAPS and to effectuate the exit strategy here in the memo of

14

understanding, was RAA going out – excuse me, was PHN going out and filing litigation against RAA in the state courts?
A. During that time, yes.
Q. Did that help this process?
A. Oh, it dramatically hindered the process. The fact is that we're talking to physicians about coming into a new group that – a direction that PHN was supportive of, and yet they were filing lawsuits against us that would contradict that. And then informing those physicians there are lawsuits out there. Whether directly or indirectly through their legal counsel.

PHN denies any interference with the formation of CAPS.

On September 21, 2006, PHN filed a Complaint in the Court of Common Pleas of Mercer County, Pennsylvania (the "State Court") seeking a judgment against RAA in the amount of $581,393.40, the balance claimed due on a September 1, 2006 invoice to RAA.

PHN filed a second Complaint in the State Court on October 19, 2006 seeking to recover $714,740.08 from RAA for a September 30, 2006 invoice.

RAA filed a similar Answer, New Matter and Counterclaim to both State Court Complaints. RAA denies liability and asserts that PHN has caused RAA monetary damage. RAA asserts, in part, that:

13. PHN failed to pay expenses that it was obligated to pay pursuant to the Employee Leasing and Interim management Services Agreement.
14. RAA paid these expenses, although they were PHN's obligation.
15. As RAA became increasingly uncomfortable of PHN's mismanagement of operations     under the Employee Leasing and Interim Management Services Agreement, on August 30, 2006, the parties entered into a Memo of Understanding (Exhibit 1) indicating that the parties would work together towards the creation of a new anesthesia private practice to be called Comprehensive Anesthesia and Pain Services, P.C. ("CAPS"). The parties agreed either to complete the venture or discontinue it on or before October 15, 2006.
16. Notwithstanding the Memo of Understanding, PHN embarked on a campaign to interfere with the organization of CAPS by, among other things:
   a. Threatening RAA with legal action;
   b. Threatening RAA's employees with enforcement of restrictive covenants in the event of the separation of the parties;

15

    c. Negotiating directly to take over RAA's service agreements with hospitals; and
    d. Conspiring with a physician, Ashraf Razzak, M.D., to form a new anesthesia practice.
17. On October 17, 2006, RAA notified PHN that it was terminating the Leasing Agreement on account of PHN's breach.

The involuntary bankruptcy filing followed on November 3, 2006. On December 11, 2006, RAA and others filed a Complaint against PHN and others in State Court against PHN alleging, <u>inter alia</u>, breach of contract, tortious interference with contractual relations.

RAA has demonstrated that there are numerous genuine issues of material fact that bear upon its liability to PHN. "[S]ubstantial factual and legal questions raised by [a] debtor preclude [a] finding of involuntary bankruptcy." <u>B.D.W. Associates, Inc. v. Busy Beaver Building Centers, Inc.</u>, 865 F.2d 65, 66-67 (3rd Cir. 1989) (citing and following <u>In re Lough</u>, 57 BR 993, 997 (Bankr. ED MI 1986), "with [the] gloss" in <u>In re Busick</u>, 831 F.2d 745 (7th Cir. 1987).

> The outcome of a dispute need not be resolved, only its presence or absence. Consequently, the court need only engage in a limited analysis of the claims at issue. <u>See In re Ramm Industries, Inc.</u>, 83 B.R. 815, 822 (Bankr.M.D.Fla.1988). The Court must not, when determining whether there is a bona fide dispute, resolve any genuine issues of fact or law. If the court determines that there is indeed a bona fide dispute, this ought not be construed as an indication of how the court would resolve that dispute. <u>In re Lough</u>, 57 B.R. 993, 997 (Bankr.E.D.Mich.1986).

<u>In re Prisuta</u>, 121 BR 474, 476 (Bankr. WD PA 1990). <u>See</u> also <u>In re Marketing and Creative Solutions, Inc.</u>, 338 BR 300, 305 (6th Cir. BAP 2006).

We conclude that PHN fails to qualify as a petitioning creditor.

For the above reasons, an Order was entered on January 5, 2007 which dismissed the involuntary Petition.

```
                        /S/
              Warren W. Bentz
              United States Bankruptcy Judge
```

c: United States District Court for the Western District of PA
Michael A. Shiner, Esq.
Bradley Tupi, Esq.
Stephen H. Hutzelman, Esq.
Stephen J. Mirizio, Esq.
Richard Cromer, Esq.